IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CODY DEE SKINNER,<br><br>               Plaintiff,<br><br>v.<br><br>BERRY PETROLEUM COMPANY, LLC,<br><br>               Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR A NEW TRIAL AND GRANTING PLAINTIFF'S MOTION FOR COSTS AND MOTION FOR PREJUDGMENT INTEREST<br><br>Case No. 1:19-cv-124-TS-DBP<br><br>Judge Ted Stewart<br>Magistrate Dustin B. Pead |

This matter comes before the Court on Defendant Berry Petroleum Company, LLC's Renewed Motion for Judgment as a Matter of Law[1] and Motion for a New Trial,[2] and on Plaintiff Cody Dee Skinner's Motion for Costs[3] and Motion for Prejudgment Interest.[4] For the reasons discussed below, the Court will deny Defendant's Motions and grant Plaintiff's Motions.

## I. BACKGROUND

Plaintiff, Cody Dee Skinner, initiated suit against Defendants, Berry Petroleum Company, LLC ("Berry") and HollyFrontier Refining and Marketing, LLC ("HollyFrontier"),

---

[1] Docket No. 194.

[2] Docket No. 195.

[3] Docket No. 188.

[4] Docket No. 189.

for injuries he incurred while employed as a crude oil truck driver.[5] During the course of litigation, the Court granted summary judgment in favor of HollyFrontier.[6]

Defendant Berry owns and operates oil well extraction sites and operations in the Uinta Basin, including the oil tank at issue in this case. After the Court denied Berry's motion for summary judgment, it scheduled a nine-day jury trial, beginning on March 3, 2025. However, after Berry decided not to call the majority of its witnesses, the trial concluded early on March 12, 2025, after seven days of trial.

At trial, Plaintiff argued that the thief hatch on the oil tank was an unsafe condition that Defendant knew about and failed to remedy, which caused Plaintiff's injuries. Defendant argued that Plaintiff failed to show by a preponderance that the thief hatch posed an unreasonable risk of harm, that Berry, not Plaintiff, was the cause of his injuries, and that exposure to oil condensate is what caused his injuries.

At the conclusion of Plaintiff's case-in-chief, Defendant made a motion for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure on the basis that Plaintiff had not presented sufficient evidence such that a reasonable jury could find that Berry breached any duty to him as a business invitee.[7] The Court denied the Motion.[8]

After trial, Defendant filed a Renewed Motion for Judgment as a Matter of Law under Federal Rule of Civil Procedure 50(b) and a Motion for a New Trial. Subsequently, Plaintiff filed a Motion for Costs and a Motion for Prejudgment Interest. The Court will address each Motion in turn below.

---

[5] Docket Nos. 2, 17.

[6] Docket No. 104.

[7] *See* Docket No. 175.

[8] Docket Nos. 167, 176.

## II. DISCUSSION

### A. Renewed Motion for Judgment as a Matter of Law

Under Federal Rule of Civil Procedure 50(a)(1), a court may grant a motion for judgment as a matter of law when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."[9] In considering such a motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."[10] "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."[11] Thus, "a motion for a judgment as a matter of law is cautiously and sparingly granted,"[12] and "is improper unless the evidence so overwhelmingly favors the moving party as to permit no other rational conclusion."[13]

A party that has made a motion for judgment as a matter of law under Rule 50(a) prior to a jury verdict, may renew that motion under Rule 50(b) after judgment is rendered. However,

---

[9] Fed. R. Civ. P. 50(a)(1).

[10] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

[11] *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986); *Liberty Mut. Fire Ins. Co. v. Woolman*, 913 F.3d 977, 983 (10th Cir. 2019) ("All reasonable inferences are drawn in favor of the nonmoving party and th[e] court does not make credibility determinations or weigh the evidence.") (internal quotation marks and citation omitted).

[12] *Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir. 1996).

[13] *Shaw v. AAA Eng'g & Drafting Inc.*, 213 F.3d 519, 529 (10th Cir. 2000); *In re: Cox Enters., Inc.*, 871 F.3d 1093, 1096 (10th Cir. 2017) (reiterating that under Rule 50, "judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position") (internal quotation marks and citations omitted).

"the renewed motion's scope is restricted to issues developed in the initial [Rule 50(a)] motion."[14]

At the close of Plaintiff's case, Defendant argued that the Court should grant judgment as a matter of law in its favor because Plaintiff failed to present sufficient evidence that Defendant had actual or constructive notice of the unsafe condition, failed to show that the thief hatch was in an unsafe or dangerous condition, and because the evidence showed that Plaintiff was the proximate cause of his injuries.

Defendant renews its argument that the Court should grant judgment as a matter of law in its favor because no reasonable jury could have concluded that Defendant owed Plaintiff a duty, that Defendant breached its duty, and that any such breach was the cause of Plaintiff's injuries.

At trial, Plaintiff argued that Defendant was liable for Plaintiff's injuries under a theory of negligence. Under Utah law, "a party asserting negligence must prove . . . : (1) a duty of reasonable care owed by the defendant to [the] plaintiff; (2) a breach of that duty; (3) the causation, both actually and proximately, of injury; and (4) the suffering of damages by the plaintiff."[15]

Because the parties stipulate that Plaintiff was a business invitee, the open and obvious danger rules applies:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he (a) knows or by exercise of reasonable care would discover the condition, and should realize it involves an unreasonable risk of harm to such invitees; *and* (b) should expect that they will not discover or

---

[14] *Michael Found., Inc. v. Urantia Found.*, 61 F. App'x 538, 544 (10th Cir. 2003).

[15] *Gregory v. Fourthwest Invs., Ltd.*, 754 P.2d 89, 91 (Utah Ct. App. 1988) (internal quotation marks and citation omitted).

realize the danger, or will fail to protect themselves against it, *and* (c) fails to exercise reasonable care to protect them against the danger.[16]

Plaintiff asserts that the "degraded and unmaintained thief hatch" was a dangerous condition that Berry negligently failed to remedy and degraded over time. At trial, Plaintiff's expert, Mr. Ziegler, testified regarding his experience with thief hatches,[17] including those that were sticky or difficult to open.[18] He testified that because of the damage "it wouldn't take very much material, volumewise[] to have a seal on that surface using the waxy material. So even if the seals are cracked, you could easily fill in the small spaces where the cracks are and have a seal with the thick wax oil."[19] Mr. Ziegler further testified that there could also be a metal-to-metal seal when the rubber seal is missing.[20]

Mr. Ziegler testified that the American Petroleum Institute ("API") sets standards for the oil industry, including oil producers.[21] He testified that under API standards, thief hatches should be inspected to make sure they are in good working order the way the manufacturer designed and intended them to work.[22] Mr. Ziegler also testified about federal regulations that govern oil production on land leased from the Bureau of Indian Affairs, which require oil companies, such as Berry, to keep their equipment in good, working order.[23] He testified that there are also manufacturer guidelines that include visually inspecting the seals to make sure they are in good

---

[16] *Hale v. Beckstead*, 2005 UT 24, ¶ 8, 116 P.3d 263 (quoting Rest. (Second) of Torts § 343).

[17] *See* Docket No. 193, at 162:18–23.

[18] *Id.* at 162:24–163:1.

[19] *Id.* at 203:13–17.

[20] *Id.* at 203:18–25.

[21] *Id.* at 178:6–16.

[22] *Id.* at 179:8–13.

[23] *Id.* at 182:2–10.

condition and to replace defective parts.[24] He further testified that Berry was responsible for cleaning and maintaining the thief hatches and keeping them in good working order and that it is his opinion that Berry created the dangerous condition by failing to do so.[25]

Plaintiff presented evidence and testimony that there was a buildup of oil around the thief hatch at issue. Plaintiff also introduced evidence that the thief hatch had a damaged pressure seal and cracked and leaking gasket.[26] Mr. Lefler testified that Berry would not replace the gaskets and seals when it was not required and because Berry did not deem it a "safety issue."[27] He also testified that there was no maintenance, repair, or replacement of the thief hatch from 2006 until the hatch was removed for litigation.[28] He testified that the thief hatch had been that way for a long time.[29] Matt Guest testified that when a well site is not required to be air tight by an air permit, that Berry does not do so.[30] Guest also testified that it is Berry's policy to only replace the seals and gaskets that are required to hold pressure due to the air permit.[31]

Based on the evidence described above, a reasonable jury could conclude that Berry had actual or constructive notice of the degraded and unmaintained thief hatch and should have realized that it posed an unreasonable risk of harm to invitees.

Turning next to Defendant's argument that Plaintiff failed to present sufficient evidence for a reasonable jury to conclude that the condition was the cause of Plaintiff's injuries.

---

[24] *Id.* at 189:24–190:6.

[25] *Id.* at 253:8–23.

[26] *Id.* at 180:15–23.

[27] Docket No. 179, at 960:12–24.

[28] *Id.* at 961:12–19.

[29] *Id.* at 958:14–959:25.

[30] Docket No. 182, at 824:25–825:6.

[31] *Id.* at 830:23–831:10.

"It is legal error for a court to grant a directed verdict on the issue of causation unless there is no evidence from which a reasonable jury might conclude that a breach of a duty proximately caused the plaintiff's injury."[32] "[E]vidence of causation is insufficient if it leaves jurors to speculate as to possibilities. Instead, the evidence must allow reasonable minds to make justifiable inferences based on all the evidence—including direct, circumstantial, and expert evidence—that a defendant's negligence . . . caused the harm."[33]

In *Smith v. Volkswagen SouthTowne, Inc.*, the Utah Supreme Court addressed the district court's conclusion that the plaintiff failed to present legally sufficient evidence to prove causation.[34] The court addressed the use of expert testimony in proving causation, stating that "[e]xpert testimony that fails to take the case out of the realm of speculation or conjecture is insufficient on its own to sustain a plaintiff's burden of proof at trial."[35] The court went on, "[b]ut such testimony may nevertheless provide a sufficient basis for a reasonable inference in combination with other evidence in this case."[36]

The court concluded that the plaintiff identified "several sets of evidence that, taken together, permitted the jury to make a non-speculative finding that" the defendant's negligence caused the plaintiff's injuries.[37] Plaintiff argues that the case here is similar because Ziegler's testimony about the cause of the incident was supported by testimony from Mr. Lefler that Berry did not maintain its thief hatches and that it was possible for black wax to fill in the cracked seal

---

[32] *Goebel v. Salt Lake City S. R.R. Co.*, 2004 UT 80, ¶ 12, 104 P.3d 1185.

[33] *Smith v. Volkswagen SouthTowne, Inc.*, 2022 UT 29, ¶ 51, 513 P.3d 729 (internal quotation marks and citations omitted).

[34] *Id.* ¶ 47.

[35] *Id.* ¶ 56.

[36] *Id.* ¶ 57.

[37] *Id.* ¶ 58.

to the point that the tank would hold pressure. He also cites to Ms. Bristol's testimony that it was possible for black wax to build up and create pressure.

Defendant argues that the case is not similar to *Smith* because "there was no physical inspection, no confirmatory testing, and no defense expert who conceded that Mr. Ziegler's theory was viable."[38] Defendant also argues that the testimony from witnesses that the tank was low-producing and did not hold pressure also cut against Plaintiff's theory of causation.

Viewing the evidence presented at trial in the light most favorable to Plaintiff, the Court finds that a reasonable jury could conclude that Defendant's breach caused Plaintiff's injuries. In addition to Mr. Ziegler's testimony, Mr. Lefler testified that it was possible for black wax crude to fill in the holes in a cracked gasket to create a seal and hold pressure and Ms. Bristol testified that it was possible for black wax crude build up to create a seal. Multiple witnesses testified that Berry did not maintain or replace thief hatch seals when they were not required to hold pressure. Further, Plaintiff introduced photographs showing black wax oil on and around the subject thief hatch. Plaintiff also testified that the thief hatch lid did not pop up as it normally would when he released the first latch and that when he crouched down to investigate and opened the second latch, he was sprayed with oil condensate and thereafter became dizzy and lost consciousness. There was also testimony from Plaintiff's experts about Plaintiff's injuries and their findings that such injuries were consistent with oil condensate exposure. This evidence provides a sufficient legal basis for a reasonable jury to conclude that Defendant's negligence caused Plaintiff's injuries. Defendant's argument about other evidence and testimony contradicting Plaintiff's evidence is not persuasive in that it would require the Court to weigh the evidence and make

---

[38] Docket No. 209, at 5.

credibility determinations, which is not permitted on a renewed motion for judgment as a matter of law. Accordingly, the Court will deny the Motion on this basis.

Defendant argues that because "the evidence does not support Mr. Ziegler's speculation that black wax built up on the hatch . . . such that it trapped a hazardous amount of pressure . . . [,] Plaintiff's admission that he disregarded his safety training is the only substantiated cause of his injuries."[39] As discussed above, a reasonable jury could conclude that Plaintiff supported his theory of causation. Defendant further argues that "no reasonable jury could conclude that Berry should have foreseen Plaintiff's decision to crouch over the hatch in violation of his training or that Berry bore the greater share of responsibility."[40]

"Where an 'invitee's attention may be distracted, such that he will not discover what is obvious, or will forget what he has discovered, or fail to protect himself against it,' a possessor of land may be liable for breaching his duty of care if he fails 'to warn . . . or to take other reasonable steps to protect [the invitee].'"[41] "While the invitee may also share responsibility for his injuries, he may still recover from the defendant in proportion to the defendant's fault. Importantly, the invitee's negligence is 'not conclusive in determining the duty of the possessor, or whether he has acted reasonably under the circumstances.'"[42]

Plaintiff testified that he opened the first latch on the thief hatch while following the standard safety protocols (up-wind, arms-length away, head turned), but when the top of the hatch stayed closed, he investigated while crouching down and released the second clip, which then caused the tank to come open and oil to spray his left side and face. Plaintiff further testified

---

[39] *Id.* at 6.

[40] *Id.*

[41] *Hale*, 2005 UT 24, ¶ 26 (quoting Rest. (2d) of Torts § 343A cmt. 1(f)).

[42] *Id.* (internal quotation marks and citation omitted).

that when the lid stayed down it indicated to him that the tank was not holding pressure. The cracked and missing seals were under the tank and therefore were not visible to Plaintiff when he opened the hatch. Plaintiff also admitted that when he was investigating the hatch he was not able to be at arm's length and was not turned away from the tank.

Based on this evidence, the Court concludes that a reasonable jury could conclude that Berry should have expected that Plaintiff would not discover or realize the danger as he believed the tank was not holding pressure because the lid stayed down and he was investigating why the hatch was not opening. Accordingly, the Court will deny the Motion.

A. Motion for New Trial

Rule 59(a)(1)(A) provides that a new trial may be granted "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."[43] "A new trial may be appropriate where the jury verdict is against the weight of the evidence, the damages are excessive, a party was prejudiced by erroneous evidentiary rulings, or the trial was not fair to the moving party."[44] A district court may not grant a new trial due to error "[u]nless justice requires otherwise."[45] "[T]he claimed error [must have] substantially and adversely affected the party's rights."[46]

"Although a trial judge has broad discretion to order a new trial, the court should also 'respect the collective wisdom of the jury' and 'in most cases the judge should accept the finding

---

[43] Fed. R. Civ. P. 59(a)(1)(A).

[44] *Megadyne Med. Prods., Inc. v. Aspen Labs., Inc.*, 864 F. Supp. 1099, 1102 (D. Utah 1994).

[45] Fed. R. Civ. P. 61.

[46] *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1217 (10th Cir. 2008)(internal quotation marks and citation omitted).

of the jury, regardless of his own doubts in the matter'"[47] "After giving the jury's findings full respect, the judge should grant a new trial only if 'the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"[48]

Defendant moves for a new trial based on four alleged errors: three based on prejudicial evidentiary rulings and one based on the denial of individual voir dire.

1. Evidentiary Rulings

"A motion for a new trial based on erroneous evidentiary rulings will be granted 'only if the error prejudicially affects a substantial right of a party.'"[49] "Erroneous evidentiary rulings 'can only be prejudicial if it can be reasonably concluded that with or without such evidence, there would have been a contrary result.'"[50] "Evidentiary rulings are reviewed under an abuse of discretion standard."[51]

a. Admission of NIOSH Alert

Defendant first challenges the admission of the NIOSH-OSHA Alert as prejudicial and erroneously admitted. Prior to trial, Defendant filed a Motion in Limine to exclude the NIOSH Alert as irrelevant and because any probative value was substantially outweighed by the danger of unfair prejudice. The Court denied Defendant's Motion in Limine to exclude the Alert and found that the Alert was relevant as Plaintiff asserted because it "could support an inference

---

[47] *Jensen v. W. Jordan City*, No. 2:12-CV-736-DAK, 2017 WL 4620983, at *12 (D. Utah Oct. 13, 2017) (quoting *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1371 (9th Cir. 1987)).

[48] *Id.* (quoting *Landes Constr. Co.*, 833 F.2d at 1372).

[49] *United States ex rel. Barrick v. Park-Migliorini Int'l, LLC*, No. 2:12-cv-00381-JNP-CMR, 2022 WL 901609, at *5 (D. Utah Mar. 25, 2022) (quoting *Hinds v. Gen. Motors Corp.*, 988 F.2d 1039, 1049 (10th Cir. 1993)).

[50] *Id.* (quoting *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1296 (10th Cir. 1998)).

[51] *United States v. Quintana*, 70 F.3d 1167, 1170 (10th Cir. 1995).

regarding the dangers of operating thief hatches and the standard of care for maintaining and using thief hatches."[52] The Court further found that "the risks of confusing the jury as argued by Defendant is low, and can be easily addressed by cross examination and argument."[53]

Federal Rule of Evidence 402 provides that only relevant evidence is admissible. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[54] Rule 403 excludes otherwise relevant evidence

> [i]f its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Defendant first argues that it was an error to admit the NIOSH Alert because it was not relevant. Defendant repeats its argument that because the Alert says nothing about the condition at the specific well site, thief hatch, tank, missing seals or leaking gaskets, or the possibility of delayed injuries from vapor exposure or injuries from hydrocarbons getting stuck to facial hair or clothing, it is irrelevant to the case.[55]

While it is true that the Alert does not discuss incidents that involve the same issues as the present case, it does discuss the dangers of opening thief hatches, including health hazards, and recommendations for maintaining and using thief hatches. As the Court concluded before, the NIOSH Alert is relevant evidence.

Defendant next argues that "the risk that the jury would give undue weight to the Alert as a governmental regulation or standard, or that it would confuse or mislead them into thinking it

---

[52] Docket No. 152, at 7.

[53] *Id.*

[54] Fed. R. Evid. 401.

[55] Docket No. 195, at 4–5.

spoke to [Plaintiff's] specific allegations was sufficiently prejudicial to outweigh any relevance,"[56] and therefore the Court abused its discretion by admitting it.

Mr. Ziegler testified that the Alert does not address thief hatches, defective or otherwise.[57] Further, Defendant elicited evidence from more than one witness about the differences between the allegations in the present case and those described in the Alert.[58] Any prejudice or confusion that may have arisen from the introduction of the Alert was cured by the additional evidence presented at trial. Accordingly, the Alert's probative value was not substantially outweighed by the claimed prejudice and confusion.

Defendant further argues that this prejudice was compounded at trial because the Alert played a "central role" in Plaintiff's evidence of liability.[59] Defendant argues that "the admission of the NIOSH Alert allowed the jury to substitute its discussion of general safety concerns and dissimilar juries for evidence of notice, breach, and causation as to Berry and Mr. Skinner."[60] However, as discussed above in the Renewed Motion, there was additional evidence supporting these elements from which a reasonable jury could conclude that Defendant was negligent.

Based on the foregoing, the Court concludes that admission of the NIOSH Alert was not erroneous. Furthermore, the Court finds that Defendant failed to present sufficient evidence to establish that even if it was an error, the outcome would have been different had the evidence been excluded. Accordingly, the Court will deny the Motion on this basis.

---

[56] *Id.* at 5.

[57] Docket No. 193, at 187:9–17.

[58] *See e.g.*, Docket No. 182, at 799:4–801:17; Docket No. 179, at 975:17–976:6.

[59] Docket No. 195, at 5.

[60] *Id.* at 6.

b.  Cross Examination of Plaintiff's Expert

Next, Defendant argues that limitations on its cross-examination of Mr. Ziegler regarding his past opinions about HollyFrontier's fault warrants a new trial.[61]

At trial, Defendant asked Plaintiff's expert, Mr. Ziegler, about his earlier reports from 2021 and 2022 that attribute fault to HollyFrontier.[62] Plaintiff objected under Federal Rule of Evidence 403, which the Court initially sustained.[63] Defendant then asked to be heard on the issue and the jury was excused.[64] Defendant argued that Mr. Ziegler's change in attribution of fault was relevant to show bias, while Plaintiff argued that the evidence was misleading to the jury about who the defendant is in the case.[65] Ultimately the Court decided "to allow a limited amount of questioning for the sole purpose of impeachment."[66] Additionally, the Court asked the parties to prepare a curative instruction to make clear that counsel's questions regarding allocation of fault were for purposes of impeachment only.[67] In part, the Court based this ruling on Defendant's own opening statement which stressed that Berry was the only defendant in the case.[68] The curative instruction was agreed to and given to the jury as Instruction No. 40, which states: "There are only two parties in this case, Berry Petroleum Company and Cody Skinner. You must disregard any evidence or testimony that would suggest any individual or entity other

---

[61] *Id.* at 9–10.

[62] Docket No. 193, at 213:6–8.

[63] *Id.* at 213:9–10.

[64] *Id.* at 213:12–16.

[65] *Id.* at 213:20–214:7.

[66] *Id.* at 215:25–216:2.

[67] *Id.* at 216:8–9, 14–16.

[68] *Id.* at 215:17–19.

than Defendant Berry Petroleum Company or Plaintiff Cody Skinner bears any potential fault in this lawsuit."[69]

In addition to the curative jury instruction, the parties and Court agreed on a brief oral instruction for the jury when they were brought back into the courtroom. The Court stated,

> Ladies and gentlemen of the jury, Ms. Shapiro is going to be allowed to ask a limited number of questions about Mr. Ziegler's earlier reports and its reference to Holly. But I do remind you, and this is important that you understand that Holly is not a party to this case. There's no one here to represent them; and therefore, this is for a very limited purpose.[70]

Defendant's counsel then asked Mr. Ziegler five substantive questions regarding his prior allocation of fault to HollyFrontier in prior reports before moving on to other subjects.[71] Defendant now argues that it was prevented "from fully exploring Mr. Zeigler's [sic] past opinions about another's fault and to impeach him based on his change of opinions once that party was no longer a target for recovery."[72] As discussed below, this argument does not have basis in the record.

To support its argument that the Court limited cross examination in error, Defendant cites to *Slusher v. Ospital by Ospital*[73] for the proposition that "the jury should be informed of the changed financial interest of the parties concerned and the realigned positions of the litigants."[74] *Slusher* relies on the idea that when one but not all of the "defendant tort-feasors enter[s] into a settlement agreement . . . the court shall, upon motion of a party disclose the existence and basic

---

[69] Docket No. 171, at 42.

[70] Docket No. 193, at 218:4–10.

[71] Docket No. 178, at 218:4–219:11.

[72] Docket No. 195, at 9–10.

[73] 777 P.2d 437 (Utah 1989).

[74] *Id.* at 444.

content of the agreement to the jury *unless* the court finds that, on facts particular to the case, such disclosure will create substantial danger of unfair prejudice, of confusing the issues, or of misleading the jury."[75] However, even though the Utah Supreme Court found that failure to disclose the settlement agreement to the jury was an error, it also concluded that the error was harmless and would not have had any effect on the outcome of the trial.[76]

The present case does not involve a settlement agreement, but rather a dismissal on the merits, and therefore the theory underlying the court's findings in *Slusher* is not applicable. Furthermore, the Court allowed Defendant to question Mr. Ziegler about his changing opinions for the purposes of impeachment. Defendant argues that it was not permitted to ask the basis for Mr. Ziegler's prior opinions or why he changed them. However, the Court never made a ruling on questions exploring these issues. Defendant did not ask Mr. Ziegler these questions nor seek input from the Court outside the presence of the jury. In fact, in discussion outside the presence of the jury, Defendant's counsel indicated "I'm just going to point out two sections in his report, and I'll move on."[77]

Defendant's reliance on *Calder v. Uintah County*[78] is also not persuasive. It is true, as the court in *Calder* explains, that "the remedy for an expert witness's bias is not exclusion but rather cross-examination,"[79] here, the Court permitted Defendant to cross examine Mr. Ziegler for impeachment purposes, just as Defendant asked to do. Accordingly, the Court concludes that it

---

[75] *Id.*

[76] *Id.* at 444–45.

[77] Docket No. 178, at 216:22–23.

[78] No. 2:17-cv-01249-JNP-CMR, 2023 WL 5045480 (D. Utah Aug. 8, 2023) (citation omitted).

[79] *Id.* at *4.

did not err in instructing Defendant to limit questions on HollyFrontier's liability to only impeachment purposes. Furthermore, the Court finds that Defendant failed to present sufficient evidence that the outcome would have been different based on the vague additional information Defendant asserts was erroneously excluded. The Court will deny the Motion on this basis.

c.    Insurance Evidence

Defendant asserts that by not allowing it to examine witnesses about the insurance benefits that Plaintiff received through his wife's employment, the Court abused its discretion.[80] Defendant argues that this created the prejudicial impression regarding Plaintiff's inability to pay for certain treatment and therefore entitles it to a new trial.[81]

Defendant filed a Motion in Limine before the start of trial to exclude the admission of any evidence regarding Plaintiff's receipt of Social Security Disability Insurance ("SSDI") benefits under Utah's collateral source rule.[82] Plaintiff did not object and the Court granted the Motion.[83] As detailed below, at trial, outside the presence of the jury, Defendant argued that Plaintiff had opened the door to evidence that Plaintiff qualified for health insurance under his wife's insurance and through his status as a veteran.[84] Defendant asserted that because witnesses testified that Plaintiff could not afford certain medical care or that it was not covered by insurance, it was entitled to bring in this information.

---

[80] Docket No. 195, at 10.

[81] *Id.* at 11.

[82] Docket No. 141.

[83] Docket No. 156.

[84] Docket No. 186, at 555:13–23.

The collateral source rule "precludes both explicit reference and methodological allusion to collateral source benefits."[85] "It has long been recognized that evidence of collateral source benefits involves a substantial likelihood of prejudicial impact."[86] The Utah Supreme Court has recognized that this prejudice can occur in two ways. "First, evidence of payment from a collateral source suggests that a plaintiff is already receiving any necessary care, which may lead the jury to 'believe that the outcome of the trial is immaterial to the party benefitting from the collateral course.'"[87] "Second, because many jurors 'do not understand the concept of subrogation rights, they will erroneously conclude that the plaintiff is seeking a windfall.'"[88] Such a "misunderstanding is 'highly prejudicial because the jury will believe that the plaintiff has already been fully compensated and is trying to obtain a double recovery,' thereby tainting the jury's decision-making process."[89] "The rule . . . is intended to 'encourage the maintenance of insurance by assuring that a plaintiff's payments from a collateral source will not be reduced by a subsequent judgment.'"[90]

Defendant asserts that the following testimony opened the door for it to bring in evidence of insurance.

First, during Plaintiff's direct examination of his expert, Dr. Judith Gooch, the following exchange took place:

---

[85] *Gardner v. Norman*, 2025 UT 47, ¶ 22, -- P.3d -- (quoting *Wilson v. IHC Hosps., Inc.*, 2012 UT 43, ¶ 2, 289 P.3d 369).

[86] *Id.* (quoting *Wilson*, 2012 UT 43, ¶ 47).

[87] *Id.* (quoting *Wilson*, 2012 UT 43, ¶ 47).

[88] *Id.* (quoting *Wilson*, 2012 UT 43, ¶ 47).

[89] *Id.* (quoting *Wilson*, 2012 UT 43, ¶ 47).

[90] *Id.* ¶ 23 (quoting *Wilson*, 2012 UT 43, ¶ 31).

Q. Generally speaking, what can you tell me about treatment options available for individuals with brain injuries. Are there a lot of options available?

A. Oh, there's not nearly enough. That's why we started this non-profit. I mean, a lot of times insurance doesn't pay over the long haul. Insurance kind of does okay with acute situations, but if it's more chronic, they often don't pay. There are very few people in this state, in this country, that treat the chronic cognitive struggles with brain injury. He, again, has emotional struggles, and he's getting treatment for that. Often times people who treat emotional struggles don't understand brain injuries. So, to find somebody that treats emotional struggles and understands brain injury is difficult.[91]

Defendant did not object or address this testimony with the Court. The next day, the following exchange occurred during Plaintiff's direct examination of Dr. Sheryl Wainwright, who created a life care plan for Plaintiff:

Q. Do you know how often he is attending [cognitive therapy]?

. . . .

A. Yes. He was attending cognitive therapy monthly. His cognitive therapist actually wanted him to go more often but he didn't have the financial resources to do that. He was going once a month.

Q. How often does his doctor want him to attend therapy?

A. I believe it is being prescribed weekly.

Q. But he is not attending weekly?

A. He is not.

Q. Due to financial constraints?

A. That is what he told me, yes.

Q. That is your understanding?

A. That is my understanding, yes.[92]

---

[91] Docket No. 184, at 473:22–474:10.

[92] Docket No. 186, at 543:24–544:16.

After Dr. Wainwright finished her testimony, outside the presence of the jury, Defendant asked the Court for permission to ask Dr. Wainwright about Plaintiff's wife's insurance and if he is able to qualify for medical benefits through that and also through his status as a veteran.[93] Plaintiff argued that the door was not opened because, if he is not receiving certain treatments, it is a reasonable question as to why not.[94] The Court agreed, concluding that it did not believe the issue had been raised to the extent that the jury was contemplating the issue and that it was a big door to open, with "an awful lot of consequences."[95] Defendant then asked if it was appropriate for it to ask Dr. Wainwright if Plaintiff is a retired veteran and if Plaintiff's wife works full time.[96] The Court permitted Defendant to ask Plaintiff's wife if she was employed.[97]

Later that day the following exchange occurred during Defendant's cross examination of Plaintiff's expert witness, Dr. Judith Gooch:

> Q. You testified in your deposition that he would need 24 physical therapy visits for the first two years followed by essentially every month for the rest of his life.
>
> A. Yes.
>
> Q. And that was back in 2022, correct?
>
> A. Yes.
>
> Q. Do you know if that has occurred?
>
> A. He was getting physical therapy and then he stopped, because he told me insurance was not paying for it. I don't know what he is getting now.[98]

---

[93] *Id.* at 555:13–23.

[94] *Id.* at 555:24–556:5.

[95] *Id.* at 556:13–16.

[96] *Id.* at 556:21–24.

[97] *Id.* at 557:12–15.

[98] *Id.* at 626:3–12.

Defendant requested a sidebar with the Court after this testimony. After a brief discussion, Defendant moved to strike the testimony, which the Court agreed to do. In the presence of the jury, Defendant stated: "We ask that the Court strike the testimony of Dr. Gooch that Mr. Skinner did not receive medical care because insurance would not cover those."[99] The Court granted the Motion and instructed the jury, "you are to disregard any reference to reasons why he did not receive care or any reference to insurance. You're not to consider that in any way."[100]

Defendant argues that Plaintiff opened the door to insurance evidence by creating the impression that no such benefits existed and when it was unable to directly counter the impression, it prejudiced Defendant "by appealing to the motions and biases of the jury."[101]

The Court rejects this contention. Defendant's argument is essentially that the speculative prejudice underlying its inability to introduce evidence of Plaintiff's insurance outweighed the substantial likelihood of prejudice recognized under the collateral source rule. As outlined above, the Court appropriately considered the references to insurance in light of the collateral source rule and concluded that the remedy was to have the references stricken. Additionally, the jury instructions included Instruction No. 39 which states:

> You should not consider sources of payment for bills that Cody Skinner has incurred, nor how the verdict in this case will be paid. If you have heard or seen any references to insurance during this trial, that information should not be a factor one way or the other in your decision-making. You should not speculate about whether a party had insurance, did not have insurance, nor the amount of insurance, if any. Doing so might produce a verdict which is not based on the evidence.[102]

---

[99] *Id.* at 628:7–9.

[100] *Id.* at 628:10–13.

[101] Docket No. 210, at 10.

[102] Docket No. 171, at 41.

Based on the foregoing, the Court concludes that the rulings restricting Defendant from introducing evidence regarding Plaintiff's insurance were not erroneous. Furthermore, the Court finds that Defendant failed to present sufficient evidence that the outcome would have been different had the evidence been introduced. Accordingly, the Court will deny the Motion on this basis.

### 2. Denial of Individual Voir Dire

Defendant next argues that it was prejudiced by its inability to sufficiently voir dire jurors regarding whether they personally suffered, or if any relatives or close friends suffered, a brain injury or from anxiety, depression, bi-polar disorder, or PTSD.[103]

During voir dire, the attorneys and the Court had a sidebar regarding questions the parties submitted for voir dire. Defendant's proposed the question: "Do you have any relatives or close friends who suffer from anxiety, depression, bipolar disorder, or PTSD?"[104] Defendant put forth the question based on anticipated testimony about Plaintiff's preexisting mental health conditions. Plaintiff had no objection to the question and the Court asked the question along with a number of others.

Twenty jurors stood indicating yes answers to at least one of the questions the Court asked. Outside of the presence of the venire, counsel and the Court had another conversation about the question and the number of jurors who stood in response. Defendant's counsel stated, "I mean I'm trying to figure out how to get out some bias people are going to be more sympathetic to somebody who is asserting these ailments if they have any bias if they discredit

---

[103] Docket No. 195, at 7. Defendant includes the brain injury question here but it was listed separately on Defendant's proposed voir dire questions. Defendant did not ask the Court to ask the question at trial and does not address it further in the Motion. *See* Docket No. 127.

[104] Docket No. 127, at 1–2.

people because of it."[105] After some discussion, the Court told Defendant's counsel: "Again, as you said a moment ago, your interest is to make sure it would not prevent them from being a totally fair and impartial juror. That is what I'm concerned about. If I were to ask that question would you be comfortable with that?"[106] to which Defendant's counsel replied, "Yes."[107] Subsequently, the Court asked the venire: "I just want to ask whether or not the fact [of having an immediate family member with one of the named mental health issues] would make it impossible for you to be a totally fair and impartial juror in this case?"[108]

Defendant did not propose or ask for any further questions regarding mental health issues and declined to individually question each of the jurors that indicated affirmatively to the first question.[109] Four jurors indicated that they could not be fair and impartial based on their experience with mental health related issues. The Court questioned the first juror further to assess bias, declined to question the second as he had already detailed his own mental health struggles, and declined to question the remaining two jurors as it was agreed that they would be stricken for cause on other grounds.[110] The Court excused the four jurors who indicated that they could not be fair and impartial based on their experiences with a mental illness. Defendant now asserts that it was prejudiced when the Court did not allow further or individual voir dire on the topic.[111]

---

[105] Docket No. 181, at 67:5–9.

[106] *Id.* at 69:17–21.

[107] *Id.* at 69:22.

[108] *Id.* at 80:24–81:2.

[109] *Id.* at 66:25–67:2.

[110] *Id.* at 81:4–25.

[111] Docket No. 195, at 8–9.

"A trial court's management of jury voir dire [is] reviewed under an abuse of discretion standard."[112]  "Generally the trial court is afforded broad discretion in conducting voir dire, but that discretion must be exercised in favor of allowing discovery of biases or prejudice in prospective jurors."[113] It is well-established that when a party does not request that a court ask certain questions or express any concern about the adequacy of voir dire, there is no abuse of discretion.[114] Further, even if Defendant raised these concerns during trial, "[w]here the trial court's voir dire questions contain the substance of a defendant's proposed inquiries and are sufficient to test a juror's impartiality, they are not clearly abusive of discretion."[115]

At trial, the Court asked Defendant's question as proposed and then asked about bias arising from having a family member with mental health diagnoses. Thus, the [C]ourt's voir dire focused on the substance of defendant's proposed inquiries," and therefore, any "refusal to interrogate the jury panel in the particular manner proposed by [D]efendant did not amount to an abuse of discretion."[116] Accordingly, the Court will deny the Motion on this basis.

---

[112] *State v. Alvarez*, 2014 UT App 179, ¶ 5, 332 P.3d 978 (internal quotation marks and citation omitted).

[113] *Depew v. Sullivan*, 2003 UT App 152, ¶ 10, 71 P.3d 601 (internal quotation marks and citation omitted).

[114] *United States v. Berryhill*, 880 F.2d 275, 278 (10th Cir. 1989) ("Neither side expressed specific concern vis à vis the adequacy of the voir dire. Under these circumstances, we shall not attribute error to the trial court's voir dire.") (citation omitted); *United States v. Lawson*, 670 F.2d 923, 926 (10th Cir. 1982) ("[N]ot having requested the trial court to ask such questions, [the defendant] cannot complain that the judge failed to initiate such questioning on his own.").

[115] *United States v. Polk*, 550 F.2d 1265, 1267 (10th Cir. 1977) (citing *United States v. Hall*, 536 F.2d 313 (10th Cir. 1976)); *Smith v. Vicorp, Inc.*, 107 F.3d 816, 818 (10th Cir. 1997) ("Th[e] line of questions was adequate to reveal the seeds of potential . . . bias and to alert plaintiff's counsel to the possible need to exercise a preemptory challenge. The court's refusal to ask the specific questions requested by plaintiff was not an abuse of discretion.").

[116] *United States v. Ainesworth*, 716 F.2d 769, 771 (10th Cir. 1983) (internal quotation marks and citation omitted).

B. Motions for Prejudgment Interest and Costs

Plaintiff moves for prejudgment interest and that the allowable court costs be added to the final judgment.

Under Utah law, "[i]n all actions brought to recover damages for personal injuries . . . caused by the negligence or willful intent of another[,] . . . the plaintiff . . . may claim interest on special damages actually incurred."[117] "Special damages include 'those expenses that [a plaintiff] ha[s] paid out of pocket, for which they have used their own money and which they will not get until the settlement of their action.'"[118] "'Special damages actually incurred' does not include damages for future medical expenses, loss of future wages, or loss of future earning capacity."[119]

Plaintiff seeks $260,732 in prejudgment interest, taking into account the 20% fault allocation to Plaintiff.[120] Plaintiff provides an affidavit from Dr. Alan Stephens stating that this calculation of prejudgment interest accounts for past income losses, past fringe benefit losses, past medical expenses, and past medical costs.[121]

Defendant argues that because the verdict form does not "differentiate between special damages that were *actually incurred* versus future medical expenses, wage loss, and loss of earning capacity," for which prejudgment interest does not apply, that any prejudgment interest

---

[117] Utah Code Ann. § 78B-5-824(1) (2025).

[118] *Marcovecchio v. Wright Med. Grp., Inc.*, No. 2:18-cv-00274, 2019 WL 1406606, at *12 (D. Utah Mar. 28, 2019) (quoting *Corbett v. Seamons*, 904 P.2d 229, 235 (Utah Ct. App. 1995)).

[119] Utah Code Ann. § 78B-5-824(6) (2025); *see also Corbett*, 904 P.2d at 235.

[120] Docket No. 189, at 2.

[121] Docket No. 189-1.

would be speculative and without basis.[122] Defendant cites to *Donatelli v. Beaumount*[123] to support its argument. There, the court concluded that it would be an error to award prejudgment interest when the verdict form did not differentiate between special and general damages even though the amount awarded was the exact amount of the plaintiff's medical expenses.[124] The court held that without additional evidence to classify the jury's damage award as an award for special damages.[125]

Here, the jury instructions define economic damages as "the amount of money that will fairly and adequately compensate Cody Skinner for measurable losses of money or property caused by Berry Petroleum's fault."[126] The instructions also state that economic damages "include reasonable and necessary expenses for medical care and other related expenses incurred in the past and those that will probably be incurred in the future"[127] and "past and future lost earnings, including lost benefits and lost earning capacity."[128]

The jury ultimately awarded Plaintiff $2,288,382 in economic damages. Unlike in *Donatelli*, where the verdict form did not differentiate between special and general damages, here the verdict form differentiated between economic (special) and noneconomic (general) damages, but the economic damage line item did not differentiate between past and future expenses. Plaintiff argues that the Court should still award prejudgment interest because unlike

---

[122] Docket No. 190, at 2.

[123] 2009 UT App 34, 204 P.3d 201.

[124] *Id.* ¶ 5.

[125] *Id.* ¶ 7.

[126] Docket No. 171, at 33.

[127] *Id.* at 35.

[128] *Id.* at 36.

general or noneconomic damages, economic damages are based on fixed, calculable amounts and therefore, the Court need not engage in speculation as to how the jury wanted to classify the damage award. The Court agrees. The fixed nature of economic damages does not involve the same speculation that the court is concerned about in *Donatelli*. The evidence presented, specifically in Plaintiff's Exhibit 43 and the testimony from Dr. Stephens, delineated the amounts of past and future damages and the total of these amounts reflect those economic damages awarded by the jury. Plaintiff's calculation of prejudgment interest is based on the amounts in Exhibit 43. Accordingly, the Court will grant the Motion and order prejudgment interest in the amount of $260,732.00.

Additionally, as the prevailing party, Plaintiff is entitled to certain court costs. Plaintiff filed the requisite declaration and memorandum requesting $5,525.61 in costs.[129] Defendant does not oppose the Motion.[130] Therefore, the Court will grant the Motion.

### III. CONCLUSION

It is therefore

ORDERED that Defendant's Renewed Motion for Judgment as a Matter of Law (Docket No. 194) is DENIED; it is further

ORDERED that Defendant's Motion for a New Trial (Docket No. 195) is DENIED; it is further

ORDERED that Plaintiff's Motion for Costs (Docket No. 188) is GRANTED; it is further

ORDERED that Plaintiff's Motion for Prejudgment Interest (Docket No. 189) is GRANTED.

---

[129] Docket No. 188.

[130] Docket No. 191.

DATED  December 23, 2025.

BY THE COURT:

_____

TED STEWART
United States District Judge